**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ADVANCE PUBLICATIONS, INC., *et al*,

               Plaintiffs,

    v.

EXECUTIVE OFFICE FOR U.S.
ATTORNEYS,

FEDERAL BUREAU OF INVESTIGATION,

              Defendants.

Civil Action No. 1:23-cv-01014

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT EXECUTIVE OFFICE FOR U.S. ATTORNEYS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

   I.   Plaintiffs' FOIA Request ....................................................................................... 2

   II.   The Instant Litigation and EOUSA's Response ................................................... 5

STANDARD OF REVIEW ................................................................................................. 6

ARGUMENT ...................................................................................................................... 7

      I.      EOUSA Conducted An Adequate Search ............................................ 7

      II.     The CCTV Footage Constitutes Law Enforcement Information Under
            Exemption 7 ..................................................................................... 8

            A.     The CCTV Footage Was Compiled for Law Enforcement Purposes ......... 9

            B.     EOUSA Properly Withheld the CCTV Footage Because Disclosure
                  Would Harm Ongoing Law Enforcement Proceedings Under
                  Exemption 7(A) ...................................................................... 10

            C.     EOUSA Properly Withheld the CCTV Footage Because Disclosure
                    Would Reveal Techniques and Procedures for Law Enforcement
                  Investigations Protected Under Exemption 7(E) ....................................... 15

            D.     EOUSA Properly Withheld the CCTV Footage Because Disclosure
                    Could Endanger the Life or Safety of Individuals Under
                  Exemption 7(F) ...................................................................... 19

      III.    EOUSA Properly Withheld Information Under Exemption 3. ............................ 21

      IV.    No Official Disclosure Has Waived EOUSA's Ability To Withhold
            Information Under Otherwise Valid FOIA Exemptions ...................................... 24

      V.    EOUSA Has Produced All Reasonably Segregable Information ........................ 27

CONCLUSION .................................................................................................................. 27

i

## **TABLE OF AUTHORITIES**

### **Cases**

*Alfred A. Knopf, Inc. v. Colby*,
  509 F.2d 1362 (4th Cir. 1975) ................................................................. 25

*Alyeska Pipeline Serv. Co. v. U.S. EPA*,
  856 F.2d 309 (D.C. Cir. 1988) ................................................................. 12

*Am. Civil Liberties Union of S. Cal. v. U.S. Citizenship & Immigr. Servs.*,
  133 F. Supp. 3d 234 (D.D.C. 2015) ........................................................ 15

*Am. Civil Liberties Union v. U.S. Dep't of Def.*,
  628 F.3d 612 (D.C. Cir. 2011) ..................................................... 9, 21, 24

*American Civil Liberties Union v. Department of Defense*,
  543 F.3d 59 (2d Cir. 2008) ....................................................................... 21

*Anand v. U.S. Dep't of Health & Human Servs.*,
  Civ. A. No. 21-1635, 2023 WL 2646815 (D.D.C. March 27, 2023) ........ 27

*Associated Press v. FBI*,
  265 F. Supp. 3d 82 (D.D.C. 2017) ........................................................... 16

*Bagwell v. U.S. Dep't of Educ.*,
  183 F. Supp. 3d 109 (D.D.C. 2016) ......................................................... 12

*Barre v. Obama*,
  932 F. Supp. 2d 5 (D.D.C. 2013) ............................................................. 25

*Blackwell v. FBI*,
  646 F.3d 37 (D.C. Cir. 2011) ............................................................. 16, 19

*Boyd v. Crim. Div. of the U.S. DOJ*,
  475 F.3d 381 (D.C. Cir. 2007) ................................................................. 12

*Brayton v. Off. of U.S. Trade Representative*,
  641 F.3d 521 (D.C. Cir. 2011) ................................................................... 6

*Buzzfeed, Inc. v. FBI*,
  613 F. Supp. 3d 453 (D.D.C. 2020) ......................................................... 25

ii

*Cause of Action v. National Archives and Records Admin.*,
   753 F.3d 210 (D.C. Cir. 2014) ........................................................................ 3

*CIA v. Sims*,
   471 U.S. 159 (1985) ............................................................................... 6, 23

*Citizens for Resp. & Ethics in Wash. v. U.S. DOJ*, ("CREW"),
   746 F.3d 1082 (D.C. Cir. 2014) ........................................... 10, 11, 13, 15

*Clemente v. FBI*,
   867 F.3d 111 (D.C. Cir. 2017) ............................................................... 9

*Ctr. for Nat'l Sec. Stud. v. U.S. DOJ*,
   331 F. 3d 918 (D.C. Cir. 2003) ............................................. 10, 12, 15

*Elec. Info. Ctr. v. U.S. Dep't of Homeland Sec.* ("*EPIC*"),
   777 F.3d 518 (D.C. Cir. 2015) ............................................. 9, 10, 19, 21

*FBI v. Abramson*,
   456 U.S. 615 (1982) ............................................................................... 6

*Fitzgibbon v. CIA*,
   911 F.2d 755 (D.C. Cir. 1990) ............................................................. 25

*Ford v. Department of Justice*,
   208 F. Supp. 3d 237 (D.D.C. 2016) ............................................. 17, 18

*Frugone v. CIA*,
   169 F.3d 772 (D.C. Cir. 1999) ............................................................. 25

*Henderson v. Off. of the Dir. of Nat'l Intel.*,
   151 F. Supp. 3d 170 (D.D.C. 2016) ............................................. 15

*John Doe Agency v. John Doe Corp.*,
   493 U.S. 146 (1989) ............................................................................... 6, 9

*Juarez v. Dep't of Justice*,
   518 F.3d 54 (D.C. Cir. 2008) ............................................................. 27

*Jud. Watch, Inc. v. U.S. Dep't of Def.*,
   715 F.3d 937 (D.C. Cir. 2013) ............................................................. 7

*Judicial Watch, Inc. v. U.S. Dept. of Def.*,
   963 F. Supp. 2d 6 (D.D.C. 2013) ............................................. 14, 26

*Kay v. FCC,*
    976 F. Supp. 23 (D.D.C., 1997) ........................................................... 11

*Larson v. Dep't of State,*
    565 F.3d 857 (D.C. Cir. 2009) .............................................. 22, 23, 24

*Leopold v. Manger,*
    630 F. Supp. 3d 71 (D.D.C. 2022) ............................................ 22, 23

*Lewis-Bey v. Dep't of Justice,*
    595 F. Supp. 2d 120 (D.D.C. 2009) ........................................... 18

*Living Rivers, Inc. v. U.S. Bureau of Reclamation,*
    272 F. Supp. 2d 1313 (D. Utah 2003) ........................................ 20

*Mapother v. DOJ,*
    3 F.3d 1533 (D.C. Cir. 1993) .................................................. 11

*Mayer Brown, LLP v. IRS,*
    562 F.3d 1190 (D.C. Cir. 2009) ............................................... 16

*Mil. Audit Project v. Casey,*
    656 F.2d 724 (D.C. Cir. 1981) ................................................. 7

*Miller v. Dep't of Justice,*
    562 F. Supp. 2d 82 (D.D.C. 2008) ........................................ 19, 21

*Miller v. U.S. DOJ,*
    872 F. Supp. 2d 12 (D.D.C. 2012) ............................................. 6

*Moore v. CIA.,*
    666 F.3d 1330 (D.C. Cir. 2011) ........................................ 24, 25, 26

*Nation Mag., Wash. Bureau v. U.S. Customs Serv.,*
    71 F.3d 885 (D.C. Cir. 1995) ................................................... 7

*NLRB v. Robbins Tire & Rubber Co.,*
    437 U.S. 214 (1978) ............................................................. 10

*Oglesby v. U.S. Dep't of Army,*
    920 F.2d 57 (D.C. Cir. 1990) ............................................... 7, 8

*Owens v. U.S. DOJ,*
    Civ. A. No. 04-1701 (JDB), 2007 WL 778980 (D.D.C. Mar. 9, 2007) .................. 12

*Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*,
    Civ. A. No. 04-377, 2006 WL 1826185 (D.D.C. 2006) ............................................. 19

*Pratt v. Webster*,
    673 F.2d 408 (D.C. Cir. 1982) .................................................................... 15

*Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*,
    ("PEER"), 740 F.3d 195 (D.C. Cir. 2014) ................................................ 9, 19

*Raher v. Fed. Bureau of Prisons*,
    Civ. A. No. 09-526, 2011 WL 2014875 (D. Or. 2011) ............................... 20

*Reps. Comm. for Freedom of the Press v. FBI*,
    548 F. Supp. 3d 185 (D.D.C. 2021) ...................................................... 15, 16

*Sabra v. U.S. Customs & Border Prot.*,
    Civ. A No 20-681, 2023 WL 1398473 (D.D.C. Jan. 31, 2023) ............... 16

*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ................................................................... 7

*Schrecker v. U.S. DOJ*,
    349 F.3d 657 (D.C. Cir. 2003) ................................................................. 7, 8

*Soghoian v. Dep't of Justice*,
    885 F. Supp. 2d 62 (D.D.C. 2012) .......................................................... 18

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ............................................................... 27

*Tooley v. Bush*,
    Civ. A. No. 06-306, 2006 WL 3783142 (D.D.C. Dec. 21, 2006) ........... 23

*Tooley v. Napolitano*,
    586 F.3d 1006 (D.C. Cir. 2009) ............................................................... 23

*United States v. McCaughey*,
    534 F. Supp. 3d 132 (D.D.C. 2021) ............................................ 11, 18, 21, 25

*United We Stand Am., Inc. v. IRS*,
    359 F.3d 595 (D.C. Cir. 2004) ................................................................... 5

*Weisberg v. U.S. DOJ*,
    627 F.2d 365 (D.C. Cir. 1980) ................................................................... 6

**<u>Statutes</u>**

2 U.S.C. § 1961 .................................................................................................... 10

2 U.S.C. § 1979 .............................................................................................. *passim*

5 U.S.C. § 552 ............................................................................................... *passim*

49  U.S.C. § 114s ................................................................................................. 23

**<u>Other Authorites</u>**

132 Cong. Rec. H9466 (daily ed. Oct. 8, 1986)........................................................ 15

U.S. Att'ys Off. for D.C., *Capitol Breach Cases*, https://www.justice.gov/usao-dc/capitol-
    breach-cases ....................................................................................................... 3

**INTRODUCTION**

This FOIA case concerns the U.S. Capitol Police's ("USCP") closed circuit television ("CCTV") footage recorded during the riots at the U.S. Capitol on January 6, 2021.  Over a thousand individuals have been charged in relation to the events that day at the Capitol, and many others are still under investigation.  To that end, the U.S. Attorneys' Office for the District of Columbia ("USAO-DC") has utilized the CCTV footage at issue in this case to secure numerous convictions and pursue investigations.

Plaintiffs—twelve news organizations—filed a FOIA request (and, subsequently, this lawsuit), contending that the Executive Office for U.S. Attorneys ("EOUSA"), is obligated to produce all of the CCTV footage within its custody.

With the exception of over 2,000 clips that have already been provided in public court proceedings, EOUSA invoked Exemption 7(A) to withhold the records in full, because the release of the not-yet-public CCTV footage in its possession could reasonably be expected to interfere in USAO-DC's ongoing enforcement actions related to the riots of January 6, 2021.  In addition, EOUSA, in consultation with USCP, determined that the records may also be categorically withheld in full pursuant to Exemptions 7(E) and 7(F), and in part pursuant to Exemption 3.  As explained more fully below, EOUSA has logically and plausibly articulated the basis for its withholdings.

In response to this straightforward application of settled FOIA law, Plaintiffs contend that the disclosure of CCTV footage *by Congress* waives *the Executive Branch's* entitlement to invoke FOIA exemptions.  But even if Congress had disclosed all of the CCTV footage—which Defendants do not concede—a disclosure by Congress effects no waiver of EOUSA's authority to

assert the specified exemptions.  Accordingly, EOUSA has satisfied its obligations under FOIA and is entitled to summary judgment.

## BACKGROUND

### I.      Plaintiffs' FOIA Request

Plaintiffs seek "copies of all closed circuit camera footage recorded on January 6, 2021, inside the United States Capitol and on its surrounding outside grounds, on Capitol surveillance cameras."[1]  Declaration of Justin P. Wilkinson ("Wilkinson Decl."), ¶ 5 (citing Compl., ECF No. 1).  During the status conference held on June 26, 2023, Plaintiffs explained that they sought "the body of 14,000 hours of video that the Speaker of the House selectively released first to Tucker Carlson."  Status Conference Transcript, at 6:21-22.  Indeed, Plaintiffs' request stems from the provision of some CCTV footage by the U.S. House of Representatives' Committee on House Administration ("CHA") to Fox News Channel's then-show "Tucker Carlson Tonight," and, later, Plaintiffs allege, to John Solomon of *Just The News* and Julie Kelly of *American Greatness*.  *Id.* at 6:20-7:3; *see also* Compl. ¶¶ 2, 40; Joint Status Report, ECF No. 9, at 1.  According to Plaintiffs, "the Speaker's Office has refused to provide the Capitol Surveillance Videos to any other news organization or journalist who has since sought access."  Compl. ¶ 2; *see also* Status Conference Transcript, at 7:4-21 (noting that, because Plaintiffs have been unsuccessful in their attempts to obtain that CCTV footage from Congress, they now sue the Executive Branch to obtain that same footage).

By way of further background, the USCP provided the CHA, its House of Representatives' oversight committee, with January 6 CCTV footage after it requested access to the same footage

---

[1] EOUSA processes and responds to all requests for records that are maintained by each of the 94 U.S. Attorneys Offices across the country.  Decl. of Justin P. Wilkinson, ¶ 1 ("Wilkinson Decl.").

that had been provided to the January 6 Select Committee.  Decl. of Thomas A. DiBiase, Attached as Exhibit B to Wilkinson Decl., ¶ 8 ("DiBiase Decl."); *see also id.* Exhibit A, ¶ 10.  "The CHA received CCV footage for the entire 24-hour period recorded on January 6, 2021, which totals over 41,000 hours."  *Id*. ¶ 8.  USCP does not know what footage the CHA actually provided to Tucker Carlson Tonight or other news organizations because it has no reliable way to audit the CHA's use of the footage in a manner that would reveal exactly who watched or obtained a portion of the footage.  *Id.* ¶ 9.  All that is readily apparent is that Tucker Carlson played approximately 25 clips of CCTV footage on his news show.  *Id.* ¶ 10.  One of these clips had been used during the Second Impeaching Hearing of former President Trump, and the remaining 24 had been authorized by the USCP for use in criminal proceedings.  *Id.* ¶ 10.

        USCP, to assist with the investigation and prosecution of individuals who committed criminal acts at the Capitol on January 6, 2021, also transferred CCTV footage recorded from approximately noon to 8 p.m. on January 6, 2021, to the FBI, totaling approximately 14,000 hours of footage.  *Id.* ¶ 6.  FBI subsequently transferred that footage to USAO-DC to facilitate the January 6, 2021, prosecutions.  Decl. of Jennifer Leigh Blackwell, Attached as Exhibit A to Wilkinson Decl., ¶ 7 ("Blackwell Decl.").[2]

        Indeed, USAO-DC has used some of the CCTV footage in its ongoing prosecution of those responsible for the events of January 6, 2021, where an estimated 2,000 to 2,500 people illegally entered the U.S. Capitol.  *Id.* ¶ 15.  It has so far charged over 1,100 individuals in connection with the events on that day.  *Id.* ¶ 5; *see also* U.S. Att'ys Off. for D.C., *Capitol Breach Cases*,

---

[2] USCP, as a congressional entity, is not subject to FOIA.  *See Cause of Action v. National Archives and Records Admin.*, 753 F.3d 210, 212 (D.C. Cir. 2014).

https://www.justice.gov/usao-dc/capitol-breach-cases (last visited Jul. 21, 2023) (listing numerous "sentences handed down in capitol breach cases").

With respect to the processing of Plaintiffs' FOIA request, Plaintiffs sought expedited processing, and, after receiving the FOIA request on March 1, 2023, EOUSA granted the request for expedition.  Wilkinson Decl. ¶ 6.  On March 20, 2023, USAO-DC informed EOUSA that it had located footage responsive to the request—approximately 11 terabytes of data.  *Id.* ¶ 8.  This was predominantly the footage that FBI provided USAO-DC: approximately eight hours of footage beginning at noon and continuing through 8:00 pm.  Blackwell Decl. ¶ 7. It totals approximately 14,000 hours.  DiBiase Decl. ¶ 6.  USAO-DC further informed EOUSA that footage that had been used as evidence in public court proceedings had already been uploaded to the secure online file exchange "USAfx."  Wilkinson Decl. ¶ 9.

USAfx is an electronic file exchange drop box that members of the media with appropriate credentials may access.  Blackwell Decl. ¶ 13.  On May 14, 2021, Chief Judge Howell issued a standing order, stating that "[m]embers of the media seeking access to video exhibits submitted to the Court in Capitol Cases may file an application . . . to the presiding judge in the case."  *Id.* ¶ 12 (quoting Standing Order No. 21-28 at 5).  "Upon grant of such media application, the government shall make the video exhibit[s] available to any member of the media with necessary access credentials provided by the government, unless the order otherwise limits access."  *Id.* (quoting Standing Order No. 21-28 at 5-6).  Thus, if a clip of the USCP CCTV footage is used in a public hearing, such as a detention hearing, sentencing hearing, or trial and the Court issues the access order, the USAO-DC will upload the clip to this accessible online drop box.  *Id.* ¶ 13.  Prior to using a clip in a public hearing, however, USAO-DC first "submits a request to the USCP for use authorization[.]"  *Id.* ¶ 11.  On or about May 15, 2023, EOUSA confirmed that Plaintiffs had been

4

granted access to the USAfx drop box, and that access remains ongoing as of July 25, 2023. Wilkinson Decl. ¶¶ 9-10, 15; *see also* Blackwell Decl. ¶¶ 13-14.

## II.     The Instant Litigation and EOUSA's Response

Plaintiffs filed their Complaint on April 12, 2023, asserting claims under FOIA against both EOUSA and the FBI.  *See* Compl.  On April 25, 2023, EOUSA transmitted its final response to Plaintiffs, denying their FOIA request in full pursuant to Exemption 7(A), with the exception of the CCTV footage already provided to Plaintiffs via USAfx.  Wilkinson Decl. ¶ 12 (citation omitted); April 25, 2023 Final Response Letter, Attached as Exhibit C to the Wilkinson Decl. EOUSA has since reviewed its response and reconfirmed its denial of Plaintiffs' request under FOIA Exemption 7(A) applied categorically.  Joint Status Report, ECF No. 9, at 4.  On June 26, 2023, the Court held a status conference and, shortly thereafter, entered a summary judgment briefing schedule as to EOUSA only.  *See* Minute Order (June 26, 2023).[3]

In this case, EOUSA is briefing just those exemptions that it contends may be asserted on a categorical basis.  Joint Status Report, ECF No. 12, at 2.  In the event that the Court denies EOUSA's motion and frame-by-frame review of the CCTV footage is required, EOUSA reserves its right to assert the exemptions below and others on an individualized basis.  *See, e.g., United We Stand Am., Inc. v. IRS,* 359 F.3d 595, 598 (D.C. Cir. 2004) (allowing agency to assert and

---

[3] FBI denied Plaintiffs' request in full on March 2, 2023, on the grounds that it was unable to identify records responsive to Plaintiffs' request.  *See* Exhibit 6 to the Compl., ECF No. 1-6.  FBI later determined that it "maintains some records responsive to the request," but that it was working to identify the volume of those records.  Joint Status Report, ECF No. 9, at 4-5.  The parties have since held discussions on holding FBI in abeyance pending resolution of EOUSA's categorical arguments in support of its motion for summary judgment, but have not yet reach an agreement. *See* Joint Status Report, ECF No. 12, at 2-3.  To the extent that FBI must later proceed in this matter, it reserves its ability "to make any applicable argument that EOUSA did not already litigate."  *Id.* at 3.

defend additional redactions on remand where agency had reserved the right to do so in district court filings).

## STANDARD OF REVIEW

The FOIA represents a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). "Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985). So, in enacting the FOIA, Congress "provided nine specific exemptions under which disclosure could be refused." *FBI v. Abramson*, 456 U.S. 615, 621 (1982). While these "exemptions are to be narrowly construed," *id.* at 630, courts must still give them "meaningful reach and application," *John Doe Agency*, 493 U.S. at 152.

A motion for summary judgment is the procedural vehicle by which FOIA cases are typically decided. *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). Summary judgment may be afforded to an agency "in a FOIA case if it demonstrates that no material facts are in dispute, it has conducted an adequate search for responsive records, and each responsive record that it has located has either been produced to the plaintiff or is exempt from disclosure." *Miller v. U.S. DOJ*, 872 F. Supp. 2d 12, 18 (D.D.C. 2012) (citing *Weisberg v. U.S. DOJ*, 627 F.2d 365, 368 (D.C. Cir. 1980)). Courts review agency responses to FOIA requests de novo. 5 U.S.C. § 552(a)(4)(B).

A court may award summary judgment in a FOIA action on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail[;]" that "demonstrate that the information withheld logically falls within the claimed exemption[s;]" and that are "not controverted by either

6

contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted).   Agency declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted).   "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (citation omitted).

## ARGUMENT

EOUSA, relying in part on declarations by USAO-DC and the USCP, sets forth logical and plausible justifications for invoking Exemptions 7(A), 7(E), 7(F), and 3 over the withheld CCTV footage, and therefore the Court should grant summary judgment in its favor.  Moreover, EOUSA has not officially and publicly disclosed any of the information withheld, and therefore Plaintiffs cannot reasonably argue that EOUSA waived any FOIA exemptions otherwise applicable.

## I.     EOUSA Conducted An Adequate Search

EOUSA, through the USAO-DC, searched for and located the responsive USCP CCTV footage recorded on January 6, 2021, in the USAO-DC's possession.   "The adequacy of an agency's search is measured by a standard of reasonableness, and is dependent upon the circumstances of the case." *Schrecker v. U.S. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003) (citation omitted).  An agency has performed an adequate search for records responsive to a FOIA request when it "make[s] 'a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).   "There is no requirement that an agency search every

7

record system[;]" an agency need only search those systems in which it believes responsive records are likely to be located.  *Oglesby*, 920 F.2d at 68.

Here, USAO-DC confirmed that its video repositories contained the USCP CCTV footage recorded on January 6, 2021, that the USAO-DC received from the FBI.  Blackwell Decl. ¶ 8.  This footage, which begins at approximately noon and continues through approximately 8:00 p.m., is roughly 11 terabytes.  *Id.* ¶ 7.

Furthermore, a notable portion of the CCTV footage requested has already been provided to members of the media on the USAfx drop box.  Blackwell Decl. ¶ 13.  EOUSA determined that Plaintiffs have access to this footage, which, as of July 19, 2023, totals over 2,100 video exhibits. *Id.* ¶¶ 13-14; Wilkinson Decl. ¶ 10.  EOUSA invokes the FOIA exemptions below only as to the portions of CCTV footage not already provided on USAfx and therefore not made publicly available by the USAO-DC.  The search EOUSA conducted with the assistance of the USAO-DC was specifically targeted to capture all requested records, and therefore was "reasonable[.]" *Schrecker*, 349 F.3d at 662.

## II.    The CCTV Footage Constitutes Law Enforcement Information Under Exemption 7

With the January 6 investigations ongoing, EOUSA properly withheld the non-public CCTV footage from disclosure under Exemption 7, protecting "records or information compiled for law enforcement purposes," the disclosure of which could reasonably be expected to cause particular harms.  5 U.S.C. § 552(b)(7).  The exemption is broken down into six parts that serve as the specific basis for withholding—Exemptions 7(A) through Exemption 7(F).  *See id.*  In this case, EOUSA has categorically withheld information under Exemptions 7(A), 7(E), and 7(F).  *See* Wilkinson Decl. ¶¶ 14-15.  The Court need not consider the propriety of EOUSA's invocation of Exemptions 7(E) and 7(F) if the Court concludes, as it should, that EOUSA properly invoked

Exemption 7(A) to withhold, on a categorical basis, the responsive records in full.  *See, e.g., Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 623 n.3 (D.C. Cir. 2011) ("We reiterate that the government need prevail on only one [FOIA] exemption; it need not satisfy both.").

### A.  The CCTV Footage Was Compiled for Law Enforcement Purposes

As a preliminary matter, "[t]o fall within any of the exemptions under the umbrella of Exemption 7, a record must have been 'compiled for law enforcement purposes,'" and the CCTV footage easily clears this bar.  *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex. ("PEER")*, 740 F.3d 195, 202–03 (D.C. Cir. 2014) (quoting 5 U.S.C. § 552(b)(7)).  "To determine 'whether records are compiled for law enforcement purposes, [the D.C. Circuit] has long emphasized that the focus is on how and under what circumstances the requested files were compiled and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'"  *Clemente v. FBI*, 867 F.3d 111, 119 (D.C. Cir. 2017) (citation omitted).  "[T]he term compiled in Exemption 7 requires that a document be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec. ("EPIC")*, 777 F.3d 518, 522 (D.C. Cir. 2015) (quoting *PEER*, 740 F.3d at 203).  "The objects sought merely must have been 'compiled' when the Government invokes the Exemption."  *John Doe Agency*, 493 U.S. at 153.

The multiple declarations submitted in this case show that the CCTV footage plainly was "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).  When EOUSA invoked Exemption 7, the CCTV footage was being "used" by the USAO-DC—and is continuing to be used—as evidence in the ongoing investigation and prosecution of those responsible for the January 6 riots. *EPIC*, 777 F.3d at 522 (citation omitted); Blackwell Decl. ¶ 15.  Moreover, it was

"gathered," *EPIC*, 777 F.3d at 522 (citation omitted), by the FBI for that purpose: "to investigate and prosecute the rioters and others who committed crimes at the U.S. Capitol[.]" Blackwell Decl. ¶ 6.  The FBI subsequently provided that footage to USAO-DC for use in those prosecutions. Blackwell Decl. ¶ 7.  Thus, the footage was "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).

Even if one looks to when the footage was created, it was originally made by USCP, which is "a law enforcement agency tasked with protecting the United States Congress[.]"  Wilkinson Decl. ¶ 18; *see also* 2 U.S.C. § 1961(a) (defining the role of the USCP).  "[T]he USCP utilizes, among other techniques, an extensive system of surveillance cameras located through the Capitol compound," Wilkinson Decl. ¶ 18, that is monitored "24-7[.]"  Di Biase Decl. ¶ 5.  It is considered by the USCP to be "the backbone" of the security for the U.S. Capitol Grounds, *id.*, and the CCTV footage was recorded on this system.  *See id.* ¶¶ 5-6.  The declarations thus conclusively establish that the CCTV footage was "compiled" for law enforcement purposes.  *See Ctr. for Nat'l Sec. Stud. v. U.S. DOJ*, 331 F. 3d 918, 926 (D.C. Cir. 2003).

### B. EOUSA Properly Withheld the CCTV Footage Because Disclosure Would Harm Ongoing Law Enforcement Proceedings Under Exemption 7(A)

Disclosure of the CCTV footage "could reasonably be expected to interfere with enforcement proceedings," and therefore EOUSA properly invoked Exemption 7(A) to protect categorically the non-public footage from disclosure. 5 U.S.C. § 552(b)(7)(A).  As the D.C. Circuit has explained, "Exemption 7(A) reflects the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'" *Citizens for Resp. & Ethics in Wash. v. U.S. DOJ ("CREW")*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)).  "To justify

10

withholding, [an agency] must therefore demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'" *Id.* (quoting *Mapother v. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)).  The latter two prongs of this analysis—pending or reasonably anticipated enforcement proceedings—typically may be satisfied by pointing to a pending investigation or proceeding.  *See id.* at 1098; *Kay v. FCC*, 976 F. Supp. 23, 38 (D.D.C., 1997) (observing that "prospective" proceedings also suffice).

Here, EOUSA withheld the CCTV footage in the USAO-DC's possession categorically as investigative and evidentiary material.  Wilkinson Decl. ¶ 19.  The USCP provided the footage to the FBI, who in turn provided it to USAO-DC, "for the purpose of assisting with the investigation and prosecution of individuals for conduct related to the events of January 6, 2021."  *Id.*  And as relevant to this case, the footage has often been used to support those prosecutions.  *See id.* ¶¶ 9, 14; Blackwell Decl. ¶ 15.

As a result, given the massive scale of the January 6 investigations and the importance of the CCTV footage to those investigations, there can be no genuine dispute that "pending or reasonably anticipated," *CREW*, 746 F.3d at 1096 (citation omitted), enforcement proceedings rely on the CCTV footage.  Blackwell Decl. ¶ 15 (observing that the "CCTV footage is continuing to be used in the ongoing investigation into the riot" at the Capitol on January 6, 2021).  "The investigation and prosecution of the Capitol Attack will likely be one of the largest in American history, both in terms of the number of defendants prosecuted and the nature and volume of the evidence," *United States v. McCaughey*, 534 F. Supp. 3d 132, 136 (D.D.C. 2021) (citation omitted), and EOUSA may continue to invoke Exemption 7(A) until all "reasonably foreseeable proceedings stemming from [the January 6th] investigation are closed."  *Kay*, 976 F. Supp. at 38.  DOJ has charged over 1,100 individuals in connection with the events of January 6, 2021, and,

given that 2,000 to 2,500 people entered the Capitol on that day, these prosecutions and investigations are still ongoing.   Blackwell Decl. ¶¶ 5, 15; *see also* Wilkinson Decl. ¶ 20. Accordingly, enforcement proceedings that may rely on the CCTV footage remain ongoing.

Moreover, premature disclosure of the CCTV footage could reasonably be expected to interfere with the January 6 enforcement proceedings.   "Releasing the withheld CCTV footage would allow current and potential defendants to circumvent efforts to bring them to justice by permitting them to take measures to destroy or tamper with evidence, intimidate potential witnesses, take measures to avoid detection, or use the CCTV footage to mischaracterize their role on January 6 to dissuade witnesses from cooperation and affect future jury members."  Wilkinson Decl. ¶ 21; *see also* Blackwell Decl. ¶ 16.   In general, agencies may withhold documents under 7(A) when they relate to an ongoing investigation and disclosure could allow the investigation's target to destroy or alter evidence, fabricate fraudulent alibis, intimidate witnesses, or otherwise improperly frustrate the government's case.  *Alyeska Pipeline Serv. Co. v. U.S. EPA,* 856 F.2d 309, 312-13 (D.C. Cir. 1988); *see also Ctr. For Nat'l Sec. Stud.*, 331 F.3d at 929 (collecting cases); *Bagwell v. U.S. Dep't of Educ.*, 183 F. Supp. 3d 109, 118 (D.D.C. 2016) ("Another recognized goal of Exemption 7(A) is to prevent litigants from identifying and intimidating or harassing witnesses." (citation omitted)); *Owens v. U.S. DOJ*, Civ. A. No. 04-1701 (JDB), 2007 WL 778980, at *8 (D.D.C. Mar. 9, 2007) (upholding the FBI's categorical invocation of Exemption 7(A) to withhold investigative records from a functional category of "Evidentiary Documents," reasoning that, among other things, disclosure could "permit suspects to avoid arrest and prosecution, 'destroy or alter evidence, fabricate fraudulent alibis, and take other actions to frustrate the government's case'" (quoting *Boyd v. Crim. Div. of the U.S. DOJ*, 475 F.3d 381, 386 (D.C. Cir.

2007))); *CREW*, 746 F.3d at 1098 (observing that "records [that] could disclose to individuals . . . the content of the government's evidence" are protected by Exemption 7(A)).

Upon premature release of the footage, potential defendants could take a variety of measures to interfere with an ongoing enforcement action.  For example, "upon studying the footage, a potential defendant could flee, or direct an accomplice to flee."  Blackwell Decl. ¶ 16. "Or, if a potential defendant identified themselves in the footage by a distinctive feature: like a tattoo or hairstyle, that person could take steps to remove the tattoo or change their hair, thus frustrating the government's attempts to identify them."  *Id.*  "The potential defendant could also destroy evidence, such as deletion of phone evidence or social media, or physical clothing."  *Id.* Similarly, "[p]remature release of the USCP CCTV footage could also cause potential defendants and those who seek to minimize their conduct on January 6, 2021, to amplify, through traditional and social media snippets, their actions that day in a way that misleadingly characterizes their conduct."  *Id.*  "Such conduct could taint potential jurors and dissuade witnesses from cooperating with the investigation."  *Id.*  And of course, given the huge number of those who illegally entered the Capitol, premature disclosure of the CCTV footage here could frustrate the prosecution of not just a single case, but possibly hundreds.  *Id.* ¶ 17.

Consequently, the USAO-DC carefully crafted a "comprehensive" system to guard against these threats.  *Id.* ¶ 9.  The USAO-DC maintains the CCTV footage in video repositories.  *Id.* ¶ 8. It has transferred specific footage clips to other repositories maintained by the Federal Public Defender and its National Litigation Support Team, but access to those repositories is governed by a standard protective order.  *Id.* ¶¶ 8-9.  Material subject to the standard protective order may be designated sensitive or highly sensitive—thus all CCTV footage has been designated as sensitive or highly sensitive.  *Id.* ¶ 9.  The protective order strictly limits the disclosure of materials

13

marked sensitive or highly sensitive, *id.* ¶ 10, and, for highly sensitive materials, restricts the manner in which a defendant may access the material. *See, e.g.* Protective Order, *United States v. Sorvisto*, Crim. No. 21-320, ECF No. 15, ¶ 6. Given the CCTV footage's sensitive nature, USAO-DC only uses the footage in a public hearing after submitting a footage use request to USCP and obtaining USCP's consent to use that footage. Blackwell Decl. ¶ 11. And, USAO-DC only uploads CCTV footage to the USAfx drop box, thus granting the media access to the footage, after the footage has been used in a public hearing and an access order is granted by the Court. Blackwell Decl. *Id.* ¶¶ 11-13. Prior to that juncture, access is strictly controlled.

Plaintiffs' allegation of congressional disclosure to some news agencies does not affect this analysis of anticipated harm because the CCTV footage, in its entirety, is not in the public domain. *See, e.g. Judicial Watch, Inc. v. U.S. Dept. of Def.,* 963 F. Supp. 2d 6, 16 (D.D.C. 2013) (observing that disclosure to certain parties does not equate with disclosure to the public); Compl. ¶¶ 40, 2 (alleging that the Speaker provided CCTV footage access to just one news organization and not to the public). As averred by Justin Wilkinson of EOUSA: "that Congress provided several media outlets access to some of the CCTV footage does not, however, diminish these harms. The scope of that access is unknown and, based on information provided to me by the USCP, only a small number of discrete segments of the CCTV footage provided to media outlets by Congress have been placed in the public domain." Wilkinson Decl. ¶ 22; *see also* DiBiase Decl. ¶ 10. Thus, because the entirety of the CCTV footage—which is what Plaintiffs demand—is not in the public domain, the negative effects of premature release on law enforcement proceedings identified above have not yet come to pass. There can be no genuine dispute that, with the January 6 investigations and prosecutions ongoing, those cases "would be jeopardized by the premature release of [the

entirety of CCTV footage.  As a result,] Exemption 7(A) applies."  *CREW*, 746 F.3d at 1098

(citation omitted).

### C.  EOUSA Properly Withheld the CCTV Footage Because Disclosure Would Reveal Techniques and Procedures for Law Enforcement Investigations Protected Under Exemption 7(E)

Next, release of approximately 14,000 hours of CCTV footage, as requested by Plaintiffs,

would expose non-public details about the use of the USCP's closed circuit video surveillance

system. Wilkinson Decl. ¶ 25; *see also* DiBiase Decl. ¶ 11.  Exposing the non-public details about

the USCP's closed circuit video surveillance system "could reasonably be expected to risk

circumvention of the law."  Wilkinson Decl. ¶ 24; *see also* DiBiase Decl. ¶ 11.  Exemption 7(E)

authorizes withholding of information compiled for law enforcement purposes if release of the

information "would disclose techniques and procedures for law enforcement investigations or

prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if

such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. §

552(b)(7)(E).  Congress intended that Exemption 7(E) protect law enforcement techniques and

procedures from disclosure, as well as techniques and procedures used in all manner of

investigations after crimes or other incidents have occurred.  *See Henderson v. Off. of the Dir. of

Nat'l Intel.*, 151 F. Supp. 3d 170, 176 (D.D.C. 2016) (citing 132 Cong. Rec. H9466 (daily ed. Oct.

8, 1986)).  The range of "law enforcement purposes" covered by Exemption 7(E) includes not only

traditional criminal law enforcement duties, but also proactive steps taken by the Government

designed to maintain national security.  *See Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 926; *Am. Civil

Liberties Union of S. Cal. v. U.S. Citizenship & Immigr. Servs.*, 133 F. Supp. 3d 234, 242 (D.D.C.

2015); *Pratt v. Webster*, 673 F.2d 408, 420 (D.C. Cir. 1982).  Moreover, it is appropriate to apply

Exemption 7(E) on a categorical basis.  *See Reps. Comm. for Freedom of the Press v. FBI*, 548 F.

Supp. 3d 185, 202 (D.D.C. 2021) (affirming the FBI's categorical invocation of Exemption 7(E) to protect records relating to nonpublic uses of the filmmaker investigative technique); *Sabra v. U.S. Customs & Border Prot.*, Civ. A. No 20-681, 2023 WL 1398473, at *11 (D.D.C. Jan. 31, 2023) (affirming the Custom and Board Patrol's categorical invocation of Exemption 7(E)).

As a general matter, "Exemption 7(E) 'sets a relatively low bar for the agency to justify withholding,'" and the Wilkinson and DiBiase declarations easily clear that hurdle. *Associated Press v. FBI*, 265 F. Supp. 3d 82, 99 (D.D.C. 2017) (quoting *Blackwell v. FBI*, 646 F.3d 37, 41-42 (D.C. Cir. 2011)). The agency need not make a "highly specific . . . showing" of risk of circumvention of the law, but only "demonstrate logically how the release of the requested information might create" such a risk. *Blackwell*, 646 F.3d at 42 (quoting *Mayer Brown, LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009)). Nor must the agency demonstrate "an actual or certain risk of circumvention" of the law; rather the agency need only show "the chance of a reasonably expected risk." *Mayer Brown*, 562 F.3d at 1193.

EOUSA invoked Exemption 7(E) in consultation with the USCP because disclosure of all of the requested footage, in the aggregate, could reasonably risk circumvention of the law. Agencies commonly invoke a "mosaic theory" under this exemption when "separate disclosures of otherwise innocuous information could be assembled by a requester or other person to reveal 'how, when, [and] under which circumstances[ ] certain techniques are employed' by law enforcement and investigative agencies." *Reporters Committee for Freedom of the Press*, 548 F. Supp. 3d at 199 (citation omitted). And here, if released in bulk, the CCTV footage would "reveal the locations of all of the surveillance cameras inside and outside the Capitol Building and the angles and span of those cameras," revealing "dead or blind spots and other vulnerabilities in the CCTV system." Wilkinson Decl. ¶ 27; *see also* DiBiase Decl. ¶ 11. Release of the CCTV footage

in the aggregate would also "permit individuals to map out the layout of the Capitol building, including its entry and exit points, sensitive office locations, such as offices of the Speaker of the House and the Senate Majority Leader, and evacuation routes."  Wilkinson Decl. ¶ 27; *see also* DiBiase Decl. ¶ 11.  This knowledge would enable bad actors and other individuals to engage in more sophisticated planning to breach the Capitol Building or engage in other criminal or nefarious activity with the Capitol compound.  Wilkinson Decl. ¶ 27.  Nor is this a hypothetical threat: beyond the Capitol's security vulnerabilities exposed on January 6, 2021:

> "USCP is aware of efforts made before January 6, 2021, including by those who participated in the events of January 6, 2021, to gather information regarding the interior layout of the U.S. Capitol, including references to the tunnels below Capitol Grounds and maps of the Capitol Building's layout—information that is generally not available"

and is considered as "security information" by the Architect of the Capitol under 2 U.S.C. § 1979 (*see infra*, page 23 (describing "security information")).  DiBiase Decl. ¶ 11, 6 n.1.[4]

This case is therefore similar to *Ford v. Department of Justice*, 208 F. Supp. 3d 237 (D.D.C. 2016), where Chief Judge Howell granted the FBI's motion for summary judgment and held that the FBI's invocation of Exemption 7(E) to protect bank surveillance footage was proper.  *Id.* at 254.  There, she agreed with the FBI's contention that, even if it were well-known that bank surveillance cameras exist and even that some cameras were visible, "other cameras may be placed at angles or in areas unknown to the public and disclosure of this information could . . . provide criminals the necessary information to circumvent the very purpose of a bank surveillance system,"

---

[4] Moreover, just as the Architect of the Capitol treats the "blueprints" of the Capitol as "security information" under 2 U.S.C. § 1979, DiBiase Decl. at 6 n.1, so too does the USCP treat the January 6, 2021, footage in the aggregate.  *Id.* ¶ 14 & 6 n.1.  "[P]ublic disclosure of thousands of hours of CC[T]V footage in the aggregate would reveal the layout of the Capitol Buildings and Grounds and the locations of the CCV cameras—information that could be harnessed to expose and exploit security vulnerabilities and weaknesses."  *Id.* ¶ 14.

17

enabling criminals to "circumvent the law." *Id.* (citation omitted).  In fact, in the context of the U.S. Capitol itself, Judge McFadden recently granted the government's motion for a protective order restricting a defendant's use of the USCP CCTV footage, reasoning that, "even if some information about the U.S. Capitol's layout is available online, USCP's footage provides far more detailed information, including, for example, the precise location of the vast network of cameras." *McCaughey*, 534 F. Supp. 3d at 140.[5]  Judge McFadden further observed: "maintaining the confidentiality of USCP's footage is vital to protecting the Capitol—especially as to those who have sought to attack it."  *Id.* at 139.

Nor are these cases anomalous: courts routinely grant summary judgment to agencies when release of surveillance information would risk circumvention of the law.  *See, e.g. Soghoian v. Dep't of Justice*, 885 F. Supp. 2d 62, 75 (D.D.C. 2012) (protecting electronic surveillance techniques because release of information showing "what information is collected, how it is collected, and more importantly, when it is not collected" could allow criminals to evade detection); *Lewis-Bey v. Dep't of Justice*, 595 F. Supp. 2d 120, 138 (D.D.C. 2009) (protecting details of electronic surveillance techniques, including the "circumstances under which the techniques were used, the specific timing of their use, and the specific location where they were employed," because disclosure of this information "would illustrate the agency's strategy in implementing these specific techniques, and, in turn, could lead to decreased effectiveness in future investigations by allowing potential subjects to anticipate . . . and identify such techniques as they are being employed" (citation omitted)).  And here, EOUSA's declaration predicts that a release of all of the CCTV footage in the aggregate could similarly "be leveraged by bad actors to

---

[5] While most of the protective orders limiting a defendant's use of the CCTV footage are entered by consent, *McCaughey,* 534 F. Supp. 3d at 142-43, the motion in *McCaughey* was opposed.  *Id.* at 136.

plan and execute future breaches of the Capitol Building or other criminal activity."  Wilkinson Decl. ¶ 27; *see also* DiBiase Decl. ¶ 10.[6]  Thus, EOUSA has met the "relatively low bar" to show that disclosure of the CCTV footage risks circumvention of the law, and this information is protected from disclosure under Exemption 7(E).  *Blackwell*, 646 F.3d at 42.

### D. EOUSA Properly Withheld the CCTV Footage Because Disclosure Could Endanger the Life or Safety of Individuals Under Exemption 7(F)

The CCTV footage in the aggregate is further protected under FOIA Exemption 7(F) because releasing the footage "could reasonably be expected to endanger the life or physical safety of any individual[.]" 5 U.S.C. § 552(b)(F).  "That language is very broad . . . . Disclosure need not *definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices." *PEER*, 740 F.3d at 205; *see also Miller v. Dep't of Justice*, 562 F. Supp. 2d 82, 124 (D.D.C. 2008) (noting that an agency need only demonstrate "some risk, not necessarily a high risk" (citation omitted)).  Furthermore, the D.C. Circuit has rejected any argument that an agency needs to identify with specificity individuals threatened by disclosure.  *EPIC*, 777 F.3d at 525 (rejecting the Second Circuit's narrower interpretation of Exemption 7(F)).  At bottom, "[i]n evaluating the validity of an agency's invocation of Exemption 7(F), the court should within limits, defer to the agency's assessment of danger."  *Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*, Civ. A. No. 04-377, 2006 WL 1826185, at *9 (D.D.C. 2006) (citation omitted).

EOUSA invoked Exemption 7(F) in consultation USCP to withhold footage that would, "[i]n the same manner that the release of the CCTV footage in the aggregate would aid future

---

[6] USAO-DC does not expect to use during the course of the January 6 prosecutions—and therefore make public through the USAfx drop box—all of the CCTV footage from that day.  Blackwell Decl. ¶ 15.

attempts to breach the Capitol Building or engage in other criminal activity," "also put all of the Capitol compound's occupants at risk of personal harm." Wilkinson Decl. ¶ 28. As described in EOUSA's declaration, many of those individuals prosecuted and involved in the events of January 6, 2021, were seeking specific members of Congress and the Vice President, and carried restraints, evidencing an intent to cause them harm. *Id.* "Even without access to the crucial security information provided by the CCTV footage [in the aggregate], individuals breached a hallway outside of the 'Speaker's Lobby,' which leads to the Chamber of U.S. House of Representatives while members were still being evacuated." *Id.* Thus, "[t]he aggregate release of the CCTV footage would enable another group or individual bad actors to devise a more sophisticated plan to engage in criminal activity that could reasonably be expected to result in physical harm" to individuals in the Capitol complex. *Id*; *see also* DiBiase Decl. ¶ 11 (describing this threat as a "dire safety risk").

Where, as here, an agency withholds records revealing critical security information about a sensitive location, courts have granted summary judgment in the agency's favor under Exemption 7(F). *See, e.g. Living Rivers, Inc. v. U.S. Bureau of Reclamation*, 272 F. Supp. 2d 1313, 1321-22 (D. Utah 2003) (relying on Exemption 7(F) to protect flood inundation maps that, if disclosed, could be used by terrorists "to compare the amount of flooding and damage that would result from attacking one dam as compared to attacking another dam" (citation omitted)); *Raher v. Fed. Bureau of Prisons*, Civ. A. No. 09-526, 2011 WL 2014875, at *11 (D. Or. 2011) (relying on Exemption 7(F) to withhold "physical security plans, blue prints, architectural floor plans, door and key lock specifications, ceiling plans, and any information regarding the internal physical structure of a BOP correctional facility"). And here, releasing the withheld footage would threaten the U.S. Capitol and its "backbone" security infrastructure. DiBiase Decl. ¶ 5. "[E]ven if some

information about the U.S. Capitol's layout is available online, USCP's footage provides far more detailed information, including, for example, the precise location of the vast network of cameras." *McCaughey*, 534 F. Supp. 3d at 140.  Thus, disclosure of the CCTV footage would be inappropriate at any time, let alone after the January 6 riots.

Furthermore, although the D.C. Circuit has rejected approaches requiring an agency to identify the individuals specifically at risk to invoke Exemption 7(F), *see EPIC*, 777 F.3d at 523–28 (declining to follow *American Civil Liberties Union v. Department of Defense*, 543 F.3d 59 (2d Cir. 2008)), here the specific individuals at risk are clearly identifiable.  They are: "Members of Congress, their staff, other Congressional employees, and visitors to the Capitol compound." Wilkinson Decl. ¶ 28.  Thus, no matter the test employed, EOUSA has more than "reasonably estimated" that there is "some risk" that this "sensitive information could be misused for nefarious ends," *Miller*, 562 F. Supp. 2d at 124 (citation omitted), and therefore it has properly invoked Exemption 7(F).

## III.    EOUSA Properly Withheld Information Under Exemption 3.

Section 1979 of Title 2 of the United States Code provides an additional, independent basis to withhold approximately 17 hours of the CCTV footage under Exemption 3.  Exemption 3 protects records that are "specifically exempted from disclosure by [another] statute" if the relevant statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld[.]"  5 U.S.C. § 552(b)(3); *see Am. Civil Liberties Union*, 628 F.3d at 617–18 (stating that Exemption 3 "incorporat[es] the protections of other shield statutes").  To withhold records under Exemption 3, an agency "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute."

*Larson v. Dep't of State*, 565 F.3d 857, 868 (D.C. Cir. 2009).[7]  Here, Section 1979 provides a framework for disclosure of USCP records designated by the Capitol Police Board as "security information," the Board previously designated approximately 17 hours of evacuation footage on January 6 as "security information", and therefore that footage is protected from disclosure under Exemption 3.

As a preliminary matter, the OPEN FOIA Act of 2009 does not bar invoking Section 1979 under Exemption 3.  The OPEN FOIA Act established an additional requirement that any statute "enacted after the date of enactment of the OPEN FOIA Act of 2009, [must] specifically cite[] to this paragraph" in order to qualify as an exempting statute under Exemption 3.  5 U.S.C. § 552(b)(3)(B).  But Section 1979's operative section, providing that USCP information deemed "security information" may only be released if certain criteria are met, was enacted in December 2004, before the date of enactment of the OPEN FOIA Act of 2009.  Thus, that provision does not bar invoking Exemption 3.

Section 1979 easily satisfies the first *Larson* prong.  It provides a "specific statutory scheme regarding public access [of USCP records] that involves the USCP Board and others considering the material and determining whether public release is appropriate[.]"  *Leopold v. Manger*, 630 F. Supp. 3d 71, 82 (D.D.C. 2022).  In *Leopold*, Chief Judge Howell held that Section 1979 displaced the common law right of public access applicable to congressional records, finding: "where Congress has enacted a particular statutory scheme governing access to certain information, that scheme 'preempts the common law right[.]'"  *Id.*  While *Leopold* applied Section 1979 in the

---

[7] As discussed above, the USCP treats the CCTV footage in the aggregate as "security information" under 2 U.S.C. § 1979. The USCP is also "currently in discussion with the Capitol Police Board about officially designating the CC[T]V footage, in the aggregate" as "security information[.]" DiBiase Decl. ¶ 14.

common law context, the court's finding that Section 1979 supplies a "specific statutory scheme regarding public access[,]" 630 F. Supp. 3d at 82, is directly applicable to Exemption 3, which requires a statute to establish "particular criteria for withholding" to fall within the Exemption's purview.  5 U.S.C. § 552(b)(3).

Specifically, Section 1979 restricts the USCP Board from releasing "any security information" to the public unless it

> "determines in consultation with other appropriate law enforcement officials, experts in security preparedness, and appropriate committees of Congress, that the release of the security information will not compromise the security and safety of the Capitol buildings and grounds or any individual whose protection and safety is under the jurisdiction of the Capitol Police."

2 U.S.C. § 1979.  As relevant to this case, Section 1979 defines "security information" as "information" that "is sensitive with respect to the policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds[.]" *Id.*  Thus, the "plain meaning" of Section 1979, *Sims*, 471 U.S. at 167, provides a non-discretionary statutory scheme for disclosure of USCP records that "displaces," any rights Plaintiffs may have under FOIA.  *Leopold*, 630 F. Supp. 3d at 82; *see also Tooley v. Bush,* Civ. A. No. 06-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006) (concluding that 49 U.S.C. § 114s qualifies as an exempting statute for sensitive security information (SSI) protected by the Transportation Security Administration) (judgment affirmed on rehearing in *Tooley v. Napolitano*, 586 F.3d 1006 (D.C. Cir. 2009)).  So just as the *Leopold* court held that Section 1979 displaced the common law right to public access, *see* 630 F. Supp. 3d at 81, this court should similarly conclude that Section 1979 is also a statute "of exemption as contemplated by Exemption 3[.]"  *Larson*, 565 F.3d at 868.

Critically, the Capitol Police Board has designated approximately 17 hours of the CCTV footage as "security information" under the statute.  DiBiase Decl. ¶ 13.  The approximately 17 hours of footage "relates to the evacuation of Members of Congress from their respective chambers on January 6, 2021, and reveals evacuation routes, as well as evacuation techniques and methods." *Id.*  Accordingly, because Section 1979 qualifies as an exemption statute under Exemption 3 and about 17 hours of the CCTV footage has been designated "security information" under that statute, EOUSA properly invoked Exemption 3 to withhold that footage.  *See* 2 U.S.C. § 1979.[8]

## IV.     No Official Disclosure Has Waived EOUSA's Ability To Withhold Information Under Otherwise Valid FOIA Exemptions.

Neither EOUSA nor USAO-DC has officially disclosed the withheld footage.  For an agency to have officially acknowledged information, such that its disclosure supersedes an agency's otherwise valid FOIA exemption claim, the plaintiff must "pinpoint [information] that both matches the plaintiff's request and has been publicly and officially acknowledged by the agency."  *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011).  "[T]he information requested must already have been made public through an official and documented disclosure."  *Id.* (citation omitted).  The official acknowledgment doctrine therefore only applies to explicit disclosures made by the agency itself—it does not apply to agency non-responses or to situations where the agency does not comment on the matter in question.  *See, e.g., Am. Civil Liberties Union*, 628 F.3d at 621-22 (official acknowledgment applies when "one in a position to know of it officially . . .

---

[8] USCP's provision of any CCTV footage to the CHA is consistent with Section 1979 because Section 1979(c) states that the statute does not "affect the ability of the Senate and the House of Representatives . . . to obtain information from the Capitol Police regarding the operations and activities of the Capitol Police that affect the Senate and House of Representatives."  2 U.S.C. § 1979(c).

say[s] that it is so") (quoting *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975)) (emphasis added).

Here, Plaintiffs allege only that Congress has disclosed the CCTV footage, *see, e.g.* Compl. ¶ 2, but, "[n]one of the withheld CCTV footage has been officially, publicly disclosed by EOUSA or the USAO-DC."  Wilkinson Decl. ¶ 21.  Indeed, black letter law dictates that "disclosure by Congress alone cannot result in a waiver of privilege [to withhold records under FOIA] because '[courts] do not deem official a disclosure made by someone other than the agency from which the information is being sought.'"  *Buzzfeed, Inc. v. FBI*, 613 F. Supp. 3d 453, 472 (D.D.C. 2020) (quoting *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999) (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 764 (D.C. Cir. 1990)); *see also Barre v. Obama*, 932 F. Supp. 2d 5, 8 (D.D.C. 2013) (noting that "information released by Congress" does not constitute an official disclosure from an agency). Moreover, not only have EOUSA and USAO-DC not disclosed the footage at issue, but USAO-DC has taken affirmative steps to *avoid* unofficial release by deeming the CCTV footage "highly sensitive," obtaining protective orders, *see McCaughey*, 534 F. Supp. 3d at 137, and providing access to non-public segments of the footage to defendants/ defense counsel only pursuant to the protective order.  Blackwell Decl. ¶¶ 9-11. In fact, even before using the footage in a public proceeding, USAO-DC seeks USCP's consent.  *Id.* ¶ 11.  As a matter of law, Plaintiffs' alleged congressional disclosure cannot waive EOUSA's right to assert its otherwise valid FOIA exemptions.

In any event, even if Congress could waive the Executive Branch's ability to maintain its exemption claims—which it cannot—Plaintiffs have "pinpoint[ed]" no official disclosure of the specific footage provided by Congress to Tucker Carlson and other news organizations but not otherwise provided to Plaintiffs on the USAfx drop box.  *Moore*, 666 F.3d at 1333.  At the June

26, 2023, status conference, Plaintiffs' counsel stated: "quite simply, we are seeking the body of 14,000 hours of video that the Speaker of the House selectively released first to Tucker Carlson." Status Conference Transcript, at 6:20-22.   But determining exactly what footage Congress provided Tucker Carlson and other news organizations is not so simple.  The entirety of the CCTV footage is clearly not in the public domain.  *See* Compl. ¶ 40 (alleging that the Speaker's office did not provide the CCTV footage to the general public); *Judicial Watch, Inc.*, 963 F. Supp. 2d at 15 ("[F]or the public domain doctrine to apply, the specific information sought must have already been 'disclosed and preserved in a permanent public record.'" (citation omitted)).  Nor can USCP execute an audit that would reliably determine what footage the CHA gave access to or provided to the news organizations at issue.  DiBiase Decl. ¶ 9.  In fact, USCP employees have been able to determine what footage was provided to news organizations—to the extent they have been able— only by watching the news like any other member of the public.  *Id.* ¶¶ 9-10.[9]  And while approximately 25 clips from the CCTV footage appear to have been publicized, *id.* ¶ 10, Plaintiffs have neither "pinpoint[ed]" whether those clips were already available to them on the USAfx drop box, nor explained how the release of approximately 25 clips somehow necessitates the release of thousands more.  *Moore*, 666 F.3d at 1333 (noting that Plaintiffs' FOIA request must match the information publicly disclosed by the agency); *see also* DiBiase Decl. ¶ 10 (stating that all of the clips publicly played by Tucker Carlson had either been used in an impeachment trial or been authorized by the USCP for USAO-DC to use in public criminal proceedings).  Therefore, under no scenario has EOUSA waived its otherwise valid FOIA exemptions.

---

[9] The USCP, as a congressional body with the CHA as its oversight committee, was required to provide the CHA the CCTV footage it requested.  DiBiase Decl. ¶ 8 (citing 2 U.S.C. § 1979(c)).

**V.      EOUSA Has Produced All Reasonably Segregable Information**

Ordinarily, when maintaining a categorical claim of exemption, segregation is not required, as the records have not been individually reviewed.  *See, e.g. Anand v. U.S. Dep't of Health & Human Servs.*, Civ. A. No. 21-1635, 2023 WL 2646815, at *23 (D.D.C. March 27, 2023).  Here, however, by withholding all CCTV footage except that which has already been placed in the USAfx drop box, EOUSA has already provided all reasonably segregable information.  *See* 5 U.S.C. § 552(b)(9).  A court may "rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008) (citation omitted).  Here, EOUSA determined, after reviewing the responsive records and in consultation with USAO-DC, that the USAO-DC had already made public many portions of reasonably segregable CCTV footage via the USAfx drop box.  Wilkinson Decl. ¶ 34.  It further determined that no additional reasonably segregable footage can be released at this time, but, as "USAO-DC continues to prosecute individuals for conduct related to the events of January 6, 2021, [it] will upload the CCTV footage clips that were used in those prosecutions" to USAfx.  *Id.*  EOUSA has thus satisfied its segregability obligations under the FOIA.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should grant EOUSA's motion for summary judgment.


 Dated: July 25, 2023                              Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

/s/*Samuel Rebo*
SAMUEL REBO (DC Bar No. 1780665)
Trial Attorney
KRISTINA A. WOLFE (VA Bar No. 71570)
Senior Trial Counsel
samuel.a.rebo@usdoj.gov
United States Department of Justice
1100 L St. NW
Washington, DC 20005
(202) 880-0206
*Counsel for Defendants*